**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CIVIL CASE NO. |
| | : | 3:20-CR-00111 (JCH) |
| v. | : | |
| | : | |
| OKECHUCKWU VALENTINE OSUJI, | : | AUGUST 9, 2024 |
|     Defendant. | : | |
| | : | |

**RULING ON MOTION FOR JUDGMENT OF ACQUITTAL OR A NEW TRIAL**

**I.     INTRODUCTION**

On May 1, 2024, following a jury trial, defendant Okechuckwu Valentine Osuji ("Mr. Osuji") was convicted of seven counts of the Superseding Indictment. See Jury Verdict (Doc. No. 248). Mr. Osuji timely filed a Motion for Judgment of Acquittal or a New Trial ("Def.'s Mot.") (Doc. No. 255) pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. For the reasons stated below, Mr. Osuji's Motion is denied.

**II.     BACKGROUND**

On January 25, 2021, the grand jury returned a seven-count Superseding Indictment against Mr. Osuji and two alleged co-conspirators. See Superseding Indictment (Doc. No. 37). The Superseding Indictment charged Mr. Osuji with one count of conspiracy to commit wire fraud, three counts of wire fraud, and three counts of aggravated identity theft. Id. at ¶¶ 1–24.

Mr. Osuji's trial began with jury selection on April 4, 2024, and evidence began on April 22, 2024. See Minute Entry for Jury Selection (Doc. No. 219); Minute Entry for Jury Trial (Doc. No. 231).

The conspiracy at issue in the trial involved what is known as a Business Email Compromise ("BEC") scheme. A BEC scheme "consists of one or more individuals targeting a business or individual through an electronic communication by pretending to be a trustworthy entity, in an effort to obtain sensitive information, money, or property." Jury Charge at 35 (Doc. No. 254).

To connect seemingly disparate email accounts when investigating a BEC scheme, law enforcement utilizes investigative techniques including, inter alia, the following: (1) recovery account linkage; (2) IP address linkage; and (3) cookie linkage. A recovery account is a secondary email that a user provides when setting up a new email account. As the name suggests, the recovery account is used to "recover" access to the new email account, such as by resetting a password. The presence of a recovery account typically indicates that the user controls both the new email account and the recovery account. See Transcript of April 22, 2024 ("4/22/24 Trial Tr.") at 201:2–9 (Doc. No. 259).

An Internet Protocol ("IP") address is a unique set of numbers assigned to a computer that is connected to the Internet. See id. at 185:8–186:4. The public can input an IP address into a commercial database to look up the corresponding computer's general geographic location. See id. at 189:3–190:1. A short span of time in which two email accounts are accessed from the same IP address indicates that the accounts were accessed from the same Internet connection. See id. at 191:14–192:1. A proxy or Virtual Private Network ("VPN") can be used to obscure a computer's true IP address. See id. at 192:2–22.

A cookie in computer terms is a text file that is downloaded to a computer when the computer visits a website. See id. at 195:1–4. A cookie may remain on the computer anywhere from days to years. See id. at 196:5–20. Two accounts are linked by cookies when a cookie is downloaded while one account is logged in but remains on the computer even when a user logs into a second separate account. See id. at 197:3–9. Accounts that are linked by cookies "would strongly suggest that all of those accounts were accessed from the same computer at that point." Id. at 199:9–10.

During its case-in-chief, the Government elicited testimony from the following witnesses: (1) Alan Bluestine, Kevin Schweitzer, and Elysia Pawlowicz, former employees of Rockview Management ("Rockview"); (2) Victor Perez, an information technology specialist who worked with Rockview to investigate the fraud; (3) Glenda Spurlock, who engaged in an online romantic relationship with a person who identified himself as Timothy Gehrig; (4) FBI Special Agent Arkadiusz Jakubowski, who was involved in the apprehension of John Muriuku Wamuigah, one of Mr. Osuji's alleged co-conspirators; (5) FBI Special Agent Timothy Swec ("SA Swec"), an agent in the computer crimes investigation squad who was not affiliated with this investigation; (6) FBI Digital Forensic Examiner Emmanuel Hatzikostas, who reviewed Wamuigah's cell phone and Mr. Osuji's laptop; and (7) FBI Task Force Officer Michael Stempien ("TFO Stempien"), the case agent assigned to the investigation.

The evidence presented by the Government included, inter alia, the following: (1) Mr. Osuji's control of the ewout.leeuwenburrg@gmail.com, luis.frascolla@gmail.com, and agoggiia@gmail.com accounts; (2) the ewout.leeuwenburrg@gmail.com account's registration of spoofed domains that were used in a BEC scheme; (3) emails purporting

3

to be sent by Bluestine, containing his and Schweitzer's names, signatures, and signature blocks, instructing Pawlowicz to transmit wires from Rockview; (4) emails from Robert Miorada, who requested two of the Rockview wire transfers, that were found in the ewout.leeuwenburrg@gmail.com account; (5) emails from Bluestine's account that were forwarded to the ewout.leeuwenburrg@gmail.com account; and (6) rules set-up in Rockview employees' email accounts that automatically and instantaneously forwarded emails to luis.frascolla@gmail.com.

Mr. Osuji testified in his own defense and denied all Counts. He also presented evidence that included, inter alia, the following: (1) his cooperation with Malaysian law enforcement; (2) his public support of law enforcement; and (3) that the luis.frascolla@gmail.com and agoggiia@gmail.com accounts were accessed while he was incarcerated.

At the close of the Government's case-in-chief, Mr. Osuji made an oral Motion for a Judgment of Acquittal on all counts, which he renewed after resting. See Oral Rule 29 Motion (Doc. No. 239); Transcript of April 29, 2024 ("4/29/24 Trial Tr.") at 44:12–14 (Doc. No. 262). The court denied Mr. Osuji's Motion and Renewed Motion. See Minute Entry (Doc. No. 240); 4/29/24 Trial Tr. at 44:15–16.

On April 29, 2024, the case was submitted to the jury. See Minute Entry (Doc. No. 242). On May 1, 2024, the jury returned a verdict of guilty as to all Counts. See Jury Verdict.

Mr. Osuji has now filed a Motion for Judgment of Acquittal or a New Trial. See Def.'s Mot.; Memorandum of Law ("Def.'s Mem.") (Doc. No. 267). The Government

opposes the Motion. <u>See</u> Opposition to Rule 29 and Rule 33 Motion ("Gov't Opp.") (Doc. No. 273).

### III.    LEGAL STANDARD

Rule 29 of the Federal Rules of Criminal Procedure requires the court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant who challenges the sufficiency of the evidence supporting a jury's guilty verdict "faces a heavy burden." <u>United States v. Avenatti</u>, 81 F.4th 171, 183–84 (2d Cir. 2023). This is because the court, in deciding a motion for a judgment of acquittal, must view the evidence in the light most favorable to the Government and draw all permissible inferences in favor of the Government. <u>United States v. Landesman</u>, 17 F.4th 298, 319 (2d Cir. 2021) (quotation marks and citation omitted). In contrast to impermissible speculation, which occurs when there is "a complete absence of probative facts to support the conclusion reached[,]" a permissible inference "is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." <u>Id.</u> at 320 (quotation marks and citation omitted). "These principles apply whether the evidence being reviewed is direct or circumstantial." <u>United States v. Chow</u>, 993 F.3d 125, 135 (2d Cir. 2021).

The conviction will not be disturbed "as long as <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Landesman</u>, 17 F.4th at 319 (quotation marks and citations omitted). The court must view the evidence "in its totality, as each fact may gain color from others." <u>Id.</u> (quotation marks and citation omitted). Additionally, the court must be careful not to substitute its determination of the weight of the evidence, or the inferences to be drawn, for that of

the jury. <u>United States v. Jabar</u>, 19 F.4th 66, 76 (2d Cir. 2021) (quotation marks and citation omitted).

Rule 33 of the Federal Rules of Criminal Procedure allows the court, on a defendant's motion, to vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Motions for new trials should be granted sparingly, and only if the court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." <u>United States v. Snyder</u>, 740 F. App'x 727, 728 (2d Cir. 2018) (quotation marks and citation omitted). In resolving a motion for a new trial under Rule 33, the court is permitted to reevaluate the evidence, but "generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility." <u>United States v. Stanley</u>, 808 F. App'x 25, 31 (2d Cir. 2020) (quotation marks and citation omitted).

## IV. DISCUSSION

### A. <u>Rule 29</u>

#### 1. Conspiracy to Commit Wire Fraud

To convict Mr. Osuji of the crime of conspiracy to commit wire fraud as charged in Count One, the jury had to find that the government had proven the following elements beyond a reasonable doubt:

(1) First, that two or more persons entered into the unlawful agreement charged in the Indictment; and

(2) Second, that Mr. Osuji knowingly became a member of the conspiracy with the specific intent that the object of the conspiracy be committed.

Jury Charge at 39. In charging the jury, the court explained that the existence of an agreement may be proven through "mutual understanding, either spoken or unspoken,

6

between two or more people to cooperate with each other to accomplish an unlawful."

Id. at 40.

> a.   There was sufficient evidence from which a rational jury
>      could find that the Government proved beyond a reasonable
>      doubt that two or more persons entered into an unlawful
>      agreement to commit wire fraud.

The Government presented evidence of two email accounts discussing the

execution of a wire fraud scheme. For example, on July 10 and 11, 2017,

ewout.leeuwenburrg@gmail.com (the "EL" account)[1] forwarded emails to

shawncarta@gmail.com (the "SC" account) discussing "a fraudulent email f[or]m

regarding a wire" and the possibility that "emails were compromised." Ex. 5015 at 28,

30. The EL account wrote to the SC account "ALMOST GOT THEM!!!! WE MUST KEEP

ON TRYING" and the SC account responded "[y]up, almost there" and asked to be kept

"posed on anything you might want to be done." Id. The Government presented

sufficient evidence from which the jury could find that the user controlling the SC

account was John Wamuigah, one of Mr. Osuji's alleged co-conspirators. This evidence

demonstrated, inter alia, that: (1) the accounts jwamuigah@gmail.com and

dvjrosskenya@gmail.com were linked by cookies to the SC account, Transcript of April

24, 2024 ("4/24/24 Trial Tr.") at 128:15–129:1 (Doc. No. 244); (2) the account

dvjrosskenya@gmail.com was associated with the alias DJ Ross, id. at 129:7–11; (3)

the locations from posts on the Instagram account for "djayross" matched the Google

---

[1] An email alias is the name associated with an email address. 4/22/24 Trial Tr. at 181:19–20.
The alias is chosen when the user sets up the email account and the alias does not have to match the
user's actual name. Id. at 182:4–10. Although the alias associated with the EL account, Ewout
Leeuwenburg, Ex. 5019, matches the name of "a senior business executive for an international water
management company," the parties stipulated that Leeuwenburg did not create the EL account or use it,
Ex. 105 at 1.

locational data for the SC account, id. at 138:9–14, 140:15–149:7; (4) the individual featured in the photos on the "djayross" Instagram account matched the photograph attached to an application for entry into the United States submitted by John Wamuigah, id. at 149:11–150:11; and (7) the home address stored for the SC account matched Wamuigah's address, see id. at 134:1–8; 4/22/24 Trial Tr. at 163:1–4.

The Government also presented extensive evidence of the EL and SC accounts manipulating documents. On January 15, 2018, the EL account emailed the SC account with instructions to alter bank account information and transfer amount on an attachment. Id. at 12. The SC account responded with documents less than hour later. Id. at 13. On October 4, 2018, the EL account sent the SC account documents titled, in part, "Invoice" and "Wire Instructions" with the following instructions:

> JOHN JUST DO THE LOGO AND PUT IT ON TOP OF THE INVOICE AND THE WIRE INSTRUCTIONS. I HAVE ALREADY WRITTEN THE CORRECT ACCOUNT DETAILS ON THE INVOICE! YOU WILL JUST HAVE TO WRITE THE CORRECT ACCOUNT DETAILS AND AMOUNT ON THE INVOICE ON THE WIRE INSTRUCTIONS[.]

Id. at 26 (emphasis in original). The SC account responded with attachments that same day. Id. at 27. These are just two examples in a pattern of similar document revision between the accounts that went on for over a year. See id. at 1–11, 14–25, 34–50, 75–80, 145–50.

After reviewing the record and construing all inferences in favor of the Government, the court concludes that there was sufficient evidence from which a rational jury could find beyond a reasonable doubt that two or more persons entered into an unlawful agreement to commit wire fraud.

      b.    <u>There was sufficient evidence from which a rational jury could find that the Government proved beyond a reasonable doubt that Mr. Osuji knowingly became a member of the conspiracy to commit wire fraud.</u>

Mr. Osuji argues that there was insufficient evidence of his participation in the conspiracy. He emphasizes that the Government did not present evidence or testimony from a co-conspirator as to Mr. Osuji's involvement in the conspiracy. <u>See</u> Def.'s Mem. at 9. Moreover, no witnesses testified that Mr. Osuji told them explicitly about his involvement in the conspiracy. <u>Id.</u>

Mr. Osuji's reliance on the lack of direct evidence is misplaced. The Second Circuit has made clear that "[b]oth the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence." <u>United States v. Jimenez</u>, 96 F.4th 317, 326 (2d Cir. 2024) (quotation marks and citation omitted). Here, there was more than sufficient evidence from which the jury could find beyond a reasonable doubt that Mr. Osuji conspired to commit wire fraud, as charged in Count One.

The Government presented evidence that Mr. Osuji knowingly became a member of the conspiracy by identifying him as the user behind the EL account. A search of the EL account demonstrated several other email accounts, including datovalentine101@gmail.com (the "DV" account) were linked by cookie to the EL account. 4/24/24 Trial Tr. at 71:8–72:8; Ex. 5010. Subscriber information for the DV account showed that the alias was Dato Valentine and the recovery account was osujivalentine4961@yahoo.com (the "OV Yahoo" account).[2] 4/24/24 Trial Tr. at 72:21–

---

[2] When called to testify, Mr. Osuji gave his name as Valentine Okechuckwu Osuji and later testified that he goes by the nickname Dato Val. Transcript of April 25, 2024 ("4/25/24 Trial Tr.") at 167:22–23, 175:16–18 (Doc. No. 260).

25; Ex. 5022. The OV Yahoo account was listed under the alias Valentine Osuji and had two verified alternate emails: osujivalentine101@gmail.com (the "OV Gmail" account) and the DV account. 4/24/24 Trial Tr. at 73:9–22; Ex. 5007. Subscriber information for the OV Gmail account showed the alias was Osuji Valentine and the recovery account was the DV account. 4/24/24 Trial Tr. at 75:16–19; Ex. 5023. The subscriber information for both the OV Yahoo and the OV Gmail accounts listed the same phone number with a Malaysian country code. 4/24/24 Trial Tr. at 73:20–22, 75:21–76:5; compare Ex. 5007, with Ex. 5023. Mr. Osuji testified that the DV email account, the OV Yahoo account, and the OV Gmail account were his personal email accounts. See Transcript of April 26, 2024 ("4/26/24 Trial Tr.") at 48:9–16 (Doc. No. 261).

A search of the laptop found at Mr. Osuji's residence showed sign-ins to accounts that had corresponded with the EL account. See Ex. 5036 at 1–2 (emails in the EL account sent to or from wengrro@gmail.com); Ex. 5037 (EL account email to Sergio Gavronsnky); Ex. 9008 at 2–3 (browser history for Mr. Osuji's laptop showing sign-ins for wengrro@gmail.com and Sergio Gavronsnky).

From August 27 to 31, 2016, sixty seven emails were forwarded from the OV Gmail account to the EL account. Ex. 5005. These emails appear to contain templates for fraudulent communications. See id. at 21 (email impersonating a detective with the subject line "FORMAT {Example} (FOR AUSTRALIAN CLIENT)"), 27 (email supplying contents of a will), 33–34 (email impersonating an attorney with the subject line "FORMAT FOR DOCUMENTS"). In one such email, princeprince4real@yahoo.com emailed the OV Gmail account requesting "advi[c]e on how to carry one client" who "within one week now he has paid me 10,000AUD in Nigeria." Id. at 20. The sender

noted that "you can see how far I have gone with [the target] and . . . I need your advi[c]e on how to go further with him so that the job no go spoil and the man go pay better money." Id. The forwarded emails also include log-in credentials for a VPN service, which SA Swec testified could be used to hide a user's true IP address and therefore prevent identification. Id. at 2–3; see 4/22/24 Trial Tr. at 192:20–22. The username for the VPN service was "datoval", which matches Mr. Osuji's nickname and the username for his personal Instagram account, "dato_val."[3] Ex. 5005 at 3; Ex. 8300.

The Government further connected Mr. Osuji to the EL account by presenting evidence comparing the timing of Google searches performed by the EL account with Mr. Osuji's posts on his social media accounts. See, e.g., Ex. 8307 at 5 (July 7, 2015 EL account Google searches for "patek philippe nautilus" and "patek philippe"); 6 (photograph posted on Mr. Osuji's Instagram account less than seven minutes after the Google searches featuring a hand holding a watch with the logo "Patek Philippe"), 7 (July 7, 2015 EL account Google searches for "hublot big bang" and "hublot"), 8 (photograph posted on Mr. Osuji's Instagram account within two minutes of the Google searches featuring a watch with the brand partially obscured but reading "HUB" followed by "OT"); see also 4/24/24 Trial Tr. at 205:25–206:13, 206:24–207:5. From February 15 to 20, 2019, the EL account performed 12 searches related to Range Rovers and Land Rovers. Ex. 8307 at 34. On March 5, 2019, Mr. Osuji posted on his Facebook that "after 1[ ] Month of Hunting – I finally put a Pen to paper today! Welcome the 2019 Land Rover Range Rover Spot SVR." Id. at 25.[4]

---

[3] Mr. Osuji did not contest that he controlled the Instagram account with the username "dato_val."
[4] Mr. Osuji testified that he did not personally purchase the vehicle; rather, it was purchased by his company, SWCC, of which he is the director. See 4/29/24 Trial Tr. at 28:16–19, 32:5–12.

Further circumstantial evidence connecting Mr. Osuji to the EL account included the similarities between the February 27, 2016 EL account searches and Mr. Osuji's Instagram post that same day. Over the course of approximately one hour, seven Google searches were performed on the EL account: two searches for the lyrics to the song "Written in the Stars," four searches for the features of flying in a first-class cabin on Emirates Airlines, including the ability to shower mid-flight, and one search for "35 k ft." Ex. 512 at 1. Less than five minutes after the last search was performed, Mr. Osuji posted a video to his Instagram captioned "Unwind in your own Private Suite and Shower at 38K Feet" with the song "Written in the Stars" playing in the background. Id. at 2. The post included the hashtag "Emirates first class." 4/29/24 Trial Tr. at 41:20–21. The video captures Mr. Osuji in a bathroom seemingly onboard an Emirates Airlines plane, holding the phone and recording the video. Id. at 42:10–22.[5]

The Government also presented evidence that Mr. Osuji, through his control of the EL account, was knowingly involved in the conspiracy. The EL account registered 189 domains with names that were slight variations of true websites. See Ex. 5017. The practice of registering domains with small variances in the spelling of true domains is known as "domain spoofing." See Transcript of April 23, 2024 ("4/23/24 Trial Tr.") at 238:6–14 (Doc. No. 243). Two of the domains that the EL account registered—biothernsolutions.com and urben-gro.com—were created within the same time frame in which a BEC scheme was perpetrated using those spoofed domains. See id. at 236:9–237:3; Ex. 102; Ex. 5017 at 1, 4.

---

[5] The Government introduced many other examples of connections between the EL account and Mr. Osuji.

Mr. Osuji argues that he testified that he did not conduct any of the EL account searches. Def.'s Mem. at 10. While a jury can accept a defendant's claim of innocence as the sole basis for an acquittal, it need not do so. See United States v. Willis, 14 F.4th 170, 182 (2d Cir. 2021) (citations omitted) (noting that "the jury was not required to accept [defendant's] alternative explanation of innocence"); United States v. Jackson, 368 F.3d 59, 65 (2d Cir. 2004) (explaining that under the presumption of innocence, a "defendant is entitled to acquittal without having to offer evidence in his defense"). Indeed, it is the province of the jury "to draw negative inferences from the defendant's trial testimony or use it to reach contrary conclusions." United States v. Bonventre, 2014 WL 3673550, at *3 (S.D.N.Y. July 24, 2014) (quotation marks and citation omitted), aff'd in part, 646 F. App'x 73 (2d Cir. 2016); see United States v. Sterling, 2023 WL 3765005, at *7 (E.D.N.Y. June 1, 2023) (same). And because "the jury is entitled to disbelieve the defendant's attempts at exculpatory explanation, . . . a testifying defendant might inadvertently add weight to the government's case." United States v. Tran, 519 F.3d 98, 106 (2d Cir. 2008) (quotation marks and citations omitted); see United States v. Velasquez, 271 F.3d 364, 371 (2d Cir. 2001) ("[A] jury may use its disbelief of a defendant's testimony to supplement the other evidence against him.").

Mr. Osuji further contends that the evidence is insufficient to show his involvement in the conspiracy because the Government presented no evidence or testimony that a witness saw him forwarding emails from the OV Gmail account to the EL account. Def.'s Mem. at 10. He relies on SA Swec's testimony that the contents of an email can be altered once it is forwarded. Id.; see 4/22/24 Trial Tr. at 217:2–5.

But even absent the emails forwarded from the OV Gmail account to the EL account, the court concludes from its review of the record, construing all inferences in favor of the Government, that there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Mr. Osuji entered into an unlawful agreement with the object of committing wire fraud as charged in the Superseding Indictment. Accordingly, Mr. Osuji's Motion for Acquittal with respect to Count One is denied.

2.    Wire Fraud

To convict Mr. Osuji of the crime of wire fraud, as charged in Counts Two through Four, the jury had to find that the government had proven the following elements beyond a reasonable doubt:

(1) First, that there was a scheme or artifice to defraud or to obtain money or property by false and fraudulent pretenses, representations, or promises, as alleged in the Indictment; and

(2) Second, that the defendant knowingly participated in the scheme, with knowledge of its fraudulent nature and with specific intent to defraud; and

(3) Third, that in the execution of that scheme to defraud or the plan to obtain money or property by means of false or fraudulent pretenses, representations or promises, the defendant used or caused the use of the interstate or foreign wires as specified in the Indictment.

Jury Charge at 47. The court emphasized that the jury "must consider Count Two, Count Three, and Count Four separately and determine whether the Government has proven all three of these elements as to each count." Id. The court explained that a scheme to defraud is "a plan to deprive another of money or property by trick, deceit, deception, or swindle." Id. at 48. It charged that "[t]he false or fraudulent representations made in furtherance of the scheme to defraud must relate to a material fact or matter" and that information is material if "a person might have considered the information that was withheld to be important in making his decision." Id. at 49.

14

The court explained that these three Counts were demarcated by three different wire transactions. Count Two related to an August 29, 2017 email instructing Pawlowicz to wire $92,250 to a bank account controlled by Spurlock. Id. at 44. Count Three related to a September 8, 2017 email instructing Pawlowicz to wire $39,128 to a bank account controlled by Spurlock. Id. at 44–45. Count Four related to an August 31, 2017 email instructing Pawlowicz to wire $98,500 to a bank account controlled by Damilare Ajibola. Id. at 45.

<blockquote>
a.    <u>There was sufficient evidence from which a rational jury could find that the Government proved beyond a reasonable doubt that there were schemes to defraud Rockview by false and fraudulent pretenses.</u>
</blockquote>

The parties do not dispute that the wire transfers underpinning Counts Two, Three, and Four were fraudulent. 4/22/24 Trial Tr. at 49:3–14. On August 29, 2017, Pawlowicz received an email, purporting to be sent by Bluestine, directing her to process a wire for $92,250. Ex. 1001. Attached to that email was a document, titled "Mutual Loan Agreement," which contained the names and signatures of Bluestine and Schweitzer. Ex. 1002. On August 31, 2017, Pawlowicz received an email, purporting to be sent by Bluestine and containing his name and signature block, directing her to process a wire for $98,500. Ex. 1016. On September 8, 2017, Pawlowicz received an email, purporting to be sent by Bluestine and containing his name and signature block, directing her to process a wire for $39,128. Ex. 1018. Bluestine and Schweitzer testified that they did not send any of these emails or sign the attachment. 4/22/24 Trial Tr. at 60:23–61:2, 63:23–64:9, 65:13–14, 66:9–13, 70:4–18, 97:23–98:4, 98:18–23.

Once the wires were processed, the funds were transferred to separate financial institutions. The Rockview wires of $92,250 and $39,128 were transmitted to a Regions

Bank account in Louisiana controlled by Spurlock. Ex. 2002 at 1, 4; see Ex. 2001 at 1.

Spurlock testified that she received the funds at the urging of Gehrig, an individual with

whom she was engaged in an online romantic relationship developed under fraudulent

pretenses.[6] See 4/22/24 Trial Tr. at 144:1–6, 150:19–24, 153:12–23. Spurlock then

transmitted three wires of $62,000, $27,000, and $38,000, to accounts identified by

Gehrig. Id. at 154:2–25.[7] The Rockview wire for $98,500 was transmitted to a Florida

PNC Bank account controlled by Ajibola. Exs. 1020, 1021. After these initial

transmittals, the Rockview wires were divided up in a series of cash withdrawals,

transactions, and additional wire transfers. 4/23/24 Trial Tr. at 162:7–163:5.

Having been retained to investigate the Rockview frauds, Perez discovered that

the email accounts for Rockview employees contained rules that would allow a bad

actor to essentially control their accounts. Rules in Schweitzer and Pawlowicz's

accounts automatically and instantaneously forwarded their emails to

---

[6] The Government presented evidence from which the jury could find that Gehrig was Tolulope
Samuel Bodunde, one of Mr. Osuji's alleged co-conspirators. Specifically, the Government presented
evidence demonstrating, inter alia, that: (1) a Google Voice number that Gehrig used to contact Spurlock
was associated with the email ksniper100@gmail.com and the name Kenneth Snipes, 4/23/24 Trial Tr. at
187:10–17; (2) Gehrig had told Spurlock that he worked with Snipes and Snipes would periodically
contact Spurlock to request money on behalf of Gehrig, 4/22/24 Trial Tr. at 148:11–19; (3) the subscriber
information for ksniper100@gmail.com listed the recovery account as kindsnipes@gmail.com, Ex. 3018;
(4) the only account linked by cookie to ksniper100@gmail.com was kulimented@gmail.com, Ex. 3003;
(5) the subscriber information for kulimented@gmail.com listed the recovery account as
tolubaba20@yahoo.com and the alias as Tolulope Bodunde, Ex. 3004; (6) the Google searches
associated with ksniper100@gmail.com included searches for "online dating scam format" and "Tolulope
Bodunde," 4/23/24 Trial Tr. at 209:9–12, 213:1–7; (7) the Facebook username "kulimented" linked to a
profile under the name "Mistar Tolulope" with a location in New York, New York, id. at 215:20–216:7; and
(8) a search of Bodunde's phone after his arrest revealed accounts for kulimented@icloud.com and
kindsnipes@gmail.com, id. at 220:7–10, 227:6–9.

[7] As for the approximately $4,000 difference between the wires Spurlock received from Rockview
and the wires she sent out, she testified that "[i]t is possible that I had sent some of that to [Gehrig] at that
time that he requested. He told me I can keep a thousand for myself and stuff if I needed it." 4/22/24 Trial
Tr. at 155:5–7.

luis.frascolla@gmail.com[8] (the "LF" account).[9] 4/22/24 Trial Tr. at 126:21–129:3; see Exs. 1010, 1011. And delegation rules gave Bluestine's account complete access to and total control over Schweitzer and Pawlowicz's accounts. See 4/22/24 Tr. at 126:8–20, 131:2–20. All three accounts had rules that would delete and mark as read any emails that contained key words, such as "login," "Verify your office 365 Account," or "FedEx Courier," as well as emails that originated from specified senders, such as BNP Paribas. Exs. 1003, 1004, 1005, 1006, 1012, 1013; see 4/22/24 Trial Tr. at 119:10–124:16, 129:4–130:23. Perez testified that these rules would not exist by default; rather, they would have to be affirmatively created. 4/22/24 Trial Tr. at 132:6–20. Bluestine, Schweitzer, and Pawlowicz testified that they did not create these rules. Id. at 90:10–15, 94:19–23, 107:3–7.

        b.    There was evidence from which a rational jury could find that the Government proved beyond a reasonable doubt that Mr. Osuji knowingly participated in the schemes to defraud Rockview.

As discussed previously in relation to Count One, the Government presented evidence from which a rational jury could conclude that Mr. Osuji controlled the EL account. And the email chain authorizing the fraudulent wire transfer that formed the basis of Count Three was forwarded from Bluestine's email account to the EL account.[10] Ex. 1018. Bluestine testified that he did not send or receive any emails in this thread,

---

[8] Although the alias associated with the LF account, Rodrigo Frascolla, Ex. 4002, matches Luis Rodrigo Frascolla, "a Senior Vice President at an international investment bank," the parties stipulated that Frascolla did not create the LF account or use it, Ex. 105 at 1–2.

[9] The parties stipulated that rules forwarding emails to the LF account were found in the email accounts of employees at two other businesses that were victims of BEC schemes. Exs. 102, 103.

[10] Indeed, multiple emails from Bluestine's account—including those unrelated to the three fraudulent wire transfers—were forwarded to the EL account. Ex. 1019. Bluestine testified that he did not receive, send, or forward these emails. See 4/22/24 Trial Tr. at 71:17–79:5.

nor did he forward the email thread to the EL account. <u>See</u> 4/22/24 Trial Tr. at 70:4–71:9.

Moreover, the emails that prompted the fraudulent wire transfers underlying Count One and Count Four were sent by Robert Miorada. Ex. 1001; Ex. 1016 at 3. While Bluestine was unfamiliar with Miorada, 4/22/24 Trial Tr. at 59:9–15, 86:11–14, there were emails from Miorada unrelated to Rockview in the EL account, Ex. 5018. Finally, the LF account, to which Rockview employees' emails were forwarded, had the recovery email maria.v.beretervide@gmail.com (the "MV" account). Ex. 4002. The browser history of a laptop recovered during the search of Mr. Osuji's home revealed that the inbox for the MV account had been visited several times. Ex. 9008 at 1, 3–4; <u>see</u> 4/23/24 Trial Tr. at 232:8–234:24.

The Government also presented evidence connecting Mr. Osuji to the LF account through the agoggiia@gmail.com email account (the "AG account"). The AG account began registering spoofed domains on August 4, 2019—less than a month after the EL account stopped registering spoofed domains. <u>See</u> Exs. 5017, 7005. The AG account contained emails from MonoVM confirming the registration of spoofed domains, including "anchoregeconcerts.org." Ex. 7004 at 89–98. The parties stipulated that this spoofed domain was used to perpetuate a BEC scheme in which the emails of the victim business' employees were automatically and instantaneously forwarded to the LF account. Ex. 103 at 4. The AG account was linked by cookies to both the LF account and the MV account. Ex. 7002. In addition to log-ins for the MV account, the browser history for the laptop found in Mr. Osuji's home showed multiple visits to MonoVM—the

domain registration website on which the AG account registered spoofed domains. Ex. 9008 at 1, 3.

Nor is the court persuaded by Mr. Osuji's emphasis on the log-ins to the LF account and AG account after he was incarcerated. See Def.'s Mem at 10–11. The Government presented evidence of named and unnamed co-conspirators throughout its case-in-chief. And TFO Stempien testified that he had not received reports of any additional fraud victims since Mr. Osuji's arrest. 4/25/24 Trial Tr. at 144:9–11. Accordingly, the jury could reasonably infer that, while Mr. Osuji controlled the LF account and AG account to execute the BEC schemes, the LF account and AG account were accessed by an accomplice while he was incarcerated. See United States v. Stanley, 928 F.2d 575, 577 (2d Cir. 1991) ("Although appellant suggests competing inferences and explanations, it is the jury's task, not ours, to choose among them."); cf. United States v. Pauling, 924 F.3d 649, 657 (2d Cir. 2019) (explaining that an "inference is a deduction or conclusion" that the jury may draw "from facts which have been established by either direct or circumstantial evidence") (quotation marks and citation omitted).

> c.   There was sufficient evidence from which a rational jury could find that the Government proved beyond a reasonable doubt that interstate wires were used to execute the schemes to defraud.

The Government also presented evidence that the fraudulent wires were transmitted from Rockview in Connecticut, 4/22/24 Trial Tr. at 56:1–4, to bank accounts in Louisiana and Florida, Exs. 1020, 1021, 2001, 2002.

The court rejects Mr. Osuji's argument that the evidence was insufficient because the Government did not present evidence connecting the money from these fraudulent

wires to Mr. Osuji or bank accounts he controlled. <u>See</u> Def.'s Mem at 9. It is not an element of the federal crime of wire fraud that the person perpetrating the fraud actually receive money as a result of the fraudulent transmission. <u>See</u> 18 U.S.C. § 1343 (making it a crime to "transmit[ ] or cause[ ] to be transmitted" a communication that is directed at "obtaining money or property by means of false or fraudulent pretenses"); <u>United States v. Gatto</u>, 986 F.3d 104, 113 (2d Cir. 2021) ("[A] defendant need not literally obtain money or property -- in the sense of putting money into his own pocket -- to violate the wire fraud statute."). Moreover, TFO Stempien testified that it is difficult for law enforcement to trace money when, as here, it is converted to cash. <u>See</u> 4/25/24 Trial Tr. at 114:23–115:5. It is similarly irrelevant that Mr. Osuji was not directly conversing with Spurlock, Def.'s Mem at 9, because a defendant does not have "to participate personally in the wire transmission, as long as it is reasonably foreseeable that the charged transmission would occur in the execution of the scheme," <u>United States v. Bahel</u>, 662 F.3d 610, 641–42 (2d Cir. 2011).

For the reasons set forth above, the court is convinced from its review of the record, construing all inferences in favor of the Government, that there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Mr. Osuji committed the act of wire fraud as charged in Counts Two, Three, and Four. Accordingly, Mr. Osuji's Motion for Acquittal with respect to Counts Two, Three, and Four is denied.

### 3.    Aggravated Identity Theft

To convict Mr. Osuji of the crime of aggravated identity theft, as charged in Counts Five through Seven, the jury had to find that the government had proven the following elements beyond a reasonable doubt:

(1) First, that the defendant knowingly used or possessed a means of identification of another person;

(2) Second, that the defendant used the means of identification during and in relation to the offense of wire fraud as charged in Count Two, Count Three, and Count Four; and

(3) Third, that the defendant acted without lawful authority.

Jury Charge at 61. The court charged that the jury "must consider each of Count Five, Count Six, and Count Seven separately and determine whether the Government has proven all three of these elements as to each count." Id.

The court explained that these Counts were broken down by the use of another person's identification in relation to the wire fraud charges. Count Five charged that in relation to the wire fraud as charged in Count Two, "Mr. Osuji 'did knowingly transfer, possess, and use, without lawful authority, the names and signatures of [Alan Bluestine] and [Kevin Schweitzer].'" Id. at 59 (quoting Superseding Indictment at 8). Count Six charged that in relation to the wire fraud as charged in Count Four, "Mr. Osuji 'did knowingly transfer, possess, and use, without lawful authority, the name of [Alan Bluestine].'" Id. (quoting Superseding Indictment at 8). Count Seven charged that in relation to the wire fraud as charged in Count Three, "Mr. Osuji 'did knowingly transfer, possess, and use, without lawful authority, the name of [Alan Bluestine].'" Id. (quoting Superseding Indictment at 8).

The Government presented sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that Mr. Osuji committed aggravated identity theft as outlined in Counts Five, Six, and Seven. As previously discussed in reviewing the record in relation to Counts Two, Three, and Four, the Government presented sufficient evidence to prove that Mr. Osuji, through his control of the EL and LF accounts, used

21

the names, signatures, and email signature blocks of Bluestine and Schweitzer to effectuate the fraudulent Rockview wire transfers. See Ex. 1002 (document titled "Mutual Loan Agreement" authorizing the $92,250 wire and purporting to contain the names and signatures of Bluestine and Schweitzer); Ex. 1018 (emails authorizing the $39,128 wire purporting to be sent by Bluestine and containing his email signature block); Ex. 1016 (emails authorizing the $98,500 wire purporting to be sent by Bluestine and containing his email signature block). Bluestine and Schweitzer testified that they did not authorize the use of their names, signatures, or email signature blocks. 4/22/24 Trial Tr. at 63:23–64:9, 65:6–66:20, 70:4–18, 97:23–98:4.

Mr. Osuji's contention that the Government failed to present direct evidence with respect to these Counts is unpersuasive for the reasons discussed previously. The court is convinced from its review of the record, construing all inferences in favor of the Government, that there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Mr. Osuji committed the act of aggravated identity theft as charged in Counts Five, Six, and Seven. Mr. Osuji's Motion for Acquittal with respect to Counts Five, Six, and Seven is therefore denied.

B.   Rule 33

Mr. Osuji moves, in the alternative, for the court to vacate the jury's verdict and grant him a new trial based on the court's decision to exclude evidence that the defendant was set-up for this crime because of his cooperation with Malaysian law enforcement. Def.'s Mem. at 11–18. The evidence at issue consists of two exhibits. Exhibit T is a blog post from Gboah.com with the headline "READ: Dato Val has been called out alongside one Moje of Extorting Money from Fellow Nigerians In Malaysia." Ex. T. The article contains multiple pictures. Id. Exhibit U is an enlargement of two

22

pictures from Exhibit T that were grouped together with accompanying text. Ex. U. Mr. Osuji argues that the exclusion of this evidence prohibited him from presenting a complete defense in violation of the Sixth and Fourteenth Amendments, and thus a new trial must be granted. Def.'s Mem. at 16–17.

The exclusion of this evidence was discussed at length. See 4/26/24 Trial Tr. at 12:25–23:7, 81:5–103:14. Ultimately, the court excluded this evidence under Rules 901 and 802 of the Federal Rules of Evidence. Rule 901 requires that "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Rule 802 states that hearsay, which "a party offers in evidence to prove the truth of the asserted in the statement," Fed. R. Evid. 801(c)(2), is "not admissible" unless an exception applies, Fed. R. Evid. 802.

The court remains convinced that exclusion of Exhibit U was proper because this evidence lacks indicia of authenticity. Unlike the multiplicity of Instagram screenshots that were entered into evidence in this case, Exhibit U contains two pictures stacked on top of each other with text to the right of the images. The top image includes Mr. Osuji and the bottom image features an individual who goes by the alias "Hushpuppi."[11] Ex. U. The username "hushpuppi" appears twice: once on top of the images and again over the text, but they differ in print size. Id.

Although defense counsel informed the court that Instagram posts may display differently depending on how they are accessed, 4/26/24 Trial Tr. at 95:3–9, the cut and

---

[11] The Government identified the individual in the bottom photo of Exhibit U as Hushpuppi. See 4/26/24 Trial Tr. at 89:17–18. The individual in the top photo with Mr. Osuji was identified by defense counsel as Mr. Moje. See id. at 22:25–23:4.

paste formatting of the images and text cannot be explained by accessing the post through a different platform.[12] There is nothing to indicate that the photo on the left and the text on the right correspond to the same Instagram post. This purported post may very well have been manufactured by an unknown actor who combined the image from one post with the text of another post. Defense counsel admitted as much, theorizing that to create Exhibit U, an individual may have taken screenshots of the components of an Instagram post—pictures and text—and "instead of top to bottom, put it side by side."[13] Id. at 99:20–21. Accordingly, because this exhibit lacks the indicia of authenticity, it was properly excluded.

Exclusion of Exhibit U was equally appropriate because it contains hearsay for which there is no exception. The text of Exhibit U claims, in part, that Mr. Osuji is a "snitch" who "has been for years using Malaysian police to fight against anyone." Ex. U. The author states that he "know[s] what to do in retaliation" and warns that Mr. Osuji should "BE READY FOR WAR." Id.

For the reasons discussed above, it is unclear that this threat was made by Hushpuppi.[14] Even if Hushpuppi authored the threat, a statement's threatening nature does not automatically support its admission. The Second Circuit has explained that "[s]tatements offered as evidence of . . . threats . . . directed to the witness, rather than

---

[12] Nor did Mr. Osuji come forward with a basis to authenticate this purported Instagram post because it was only accessed through the Exhibit T blog and not Instagram itself. See id. at 99:7 (defense counsel noting that she had "never been on Hushpuppi's Instagram"). In sum, the exhibit appears to be a cut and paste of one or more posts, rather than an original Instagram post.

[13] See id. at 98:14–99:11 (defense counsel acknowledging that she had not seen an Instagram post formatted in this fashion and noting that the text in Exhibit U, appearing below the username, is what "would be posted below a photo on a phone" rather than to the side).

[14] Mr. Osuji was permitted to testify—and did so—as to his belief that he was threatened. Id. at 104:7–19, 113:21–22.

for the truth of the matter asserted therein, are not hearsay." United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) (citation omitted); see United States v. Cummings, 858 F.3d 763, 773 (2d Cir. 2017) (explaining that the threat "I am going to shoot [witness] in the face" would be "admissible if offered not for the truth of the matter asserted—that [declarant] actually would shoot [witness] in the face"). The Advisory Committee Notes clarify that, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) Advisory Committee Note on 1972 amendment.

Mr. Osuji, however, did not seek to use Exhibit U as evidence that a threat was made. Rather, he sought admission of this evidence to prove the truth of the matter asserted: That Hushpuppi "kn[ew] what to do in retaliation" by framing Mr. Osuji for these charges. Ex. U. Such a use renders Exhibit U inadmissible hearsay.

The problems with Exhibit U are only magnified in Exhibit T. Exhibit T includes the purported Instagram post isolated as Exhibit U, as well as advertisements, assorted images of Mr. Osuji, and various text purportedly authored by "ebony_2341," "madameclarabond707," and "Anonymous." Ex. T at 3–4. The court was not persuaded that these statements could be admitted for a purpose other than the truth, rendering the exhibit inadmissible hearsay.

Finally, Mr. Osuji is correct that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quotation marks and citation omitted); see Def.'s Mem. at 16–17. However, that "right is subject to reasonable restrictions" and the "federal rules of evidence may restrict evidence to assure both fairness and reliability in the

ascertainment of guilt and innocence." <u>United States v. Al Kassar</u>, 660 F.3d 108, 123 (2d Cir. 2011) (quotation marks and citation omitted). The evidence in question here was reasonably restricted for such a purpose. The evidence lacked any indicia of authenticity, and even if its authenticity had been verified, it constituted impermissible hearsay. Accordingly, Mr. Osuji's Motion for a New Trial is denied.

## V.    CONCLUSION

For the reasons stated above, Mr. Osuji's Motion for Judgment of Acquittal or a New Trial (Doc. No. 255) is denied.

**SO ORDERED.**

Dated at New Haven, Connecticut this 9th day of August 2024.


      /s/ Janet C. Hall
Janet C. Hall
United States District Judge

26